Opinion by
Mr. Justice Schauer.
Plaintiff corporation brought suit for $16,000 against Kayser and other named defendants for damages for the breach of an alleged oral contract. Kayser admitted liability to plaintiff in the amount of $640 only, while the other defendants denied any liability. During the proceedings the case was dismissed as to the other named defendants, leaving only the liability of Kayser to plaintiff as the issue for determination by the jury. The jury returned its verdict in favor of plaintiff for $4240 and judgment was entered on the verdict. Necessity for the filing of a motion for new trial was dispensed with.
*317 Thereafter Kayser filed a motion for judgment notwithstanding the verdict. This motion was granted, the verdict and original judgment were set aside, and the court entered judgment in favor of the plaintiff for $640, plus interest and costs, being the amount of the indebtedness to plaintiff admitted by Kayser. Again, the necessity for filing a motion for new trial was dispensed with.
This writ of error is directed to the order of the trial court setting aside the jury’s verdict and the judgment entered thereon.
Throughout the trial the witnesses, as representatives of their respective companies, were referred to by name, and for the purpose of brevity we will follow the same procedure.
Yerlin M. Pry, or Pry, is president of the plaintiff corporation, which is classed as a dealer or manufacturer’s representative, engaged in the sale of construction equipment such as here involved. David C. Card is vice-president of the Card Iron Works Company, which fabricates rail cars upon which cement mixers are conveyed and installs the mixers upon such cars. Joseph Jurneke, or Jurneke, is the project manager of The Climax Molybdenum Company, operator of a large mine at Climax, Colorado. These witnesses were at all times pertinent hereto acting within the scope of their authority. Allan J. Kayser, or Kayser, is an electrical engineer and consultant, and operates a wholly-owned corporation known as the Graser Company, largely engaged in the sale of component parts for mining equipment. He had sufficient technical knowledge to design the barrels hereinafter referred to.
The following brief statement of the background of this controversy will serve to clarify the issue for determination.
Jurneke and his associates had decided to modernize the method of mixing cement in transit within the Climax mine. This would require the design and manu *318 facture of four rotating barrels in which the aggregate (the cement, water, etc.) would be mixed in transit. The barrels were to be of a special design, custom made, and mounted on a certain type of rail cars which could be fabricated by Card and could be accommodated in the existing tunnels in the mine, considering their height and curvatures and the necessary electrical equipment.
Through various contacts the parties to this action learned of the project and each desired to participate. Pry and Card had done business with the Climax Company for many years, and each was on the “preferred list” of suppliers. After several conferences between Jurneke, Pry, Card and Kayser, three bids were submitted and the bid of Card was accepted for four complete units. The barrels installed on rail cars were then delivered and paid for.
Card and Kayser had entered into the following agreement after Card obtained the contract:
“Sept 7, 1960
“With reference to Climax Moly’s order to us for 4 concrete mixers, this order was obtained by joint effort of A. J. Kayser and Card Iron Works. It was agreed to share the profits from this joint venture after Card Iron Works and/or A. J. Kayser were first reimbursed fully for all costs incurred in its execution including cost of carrying the work-in-process inventory.
/s/ D. C. Card
/s/ Allan J. Kayser”
It is admitted in the record that Card made nothing on his contract, but in fact sustained a loss of approximately $700, which he absorbed.
Kayser testified that on the occasion of his first meeting with Pry, and after a four-hour conference with him and one Willis, an associate of Kayser, an oral agreement was made. The agreement provided in effect that whatever profit Kayser should realize from the Climax deal would be split three ways — one-third to Kayser, one-third to Pry, and one-third to Willis for *319 bringing the men together on the deal. Pry denied this, but Willis confirmed Kayser’s version of the transaction. At any rate, component parts of these units were sold by Kayser to Card, at a profit to Kayser of $1920. Kayser retained his third and made settlement with Willis for his third. He offered Pry his third, $640, but Pry refused to accept it. Kayser admitted this indebtedness to Pry of $640, both in the pleadings and at the pre-trial conference, and it was for this amount that the trial court awarded plaintiff judgment after granting Kayser’s motion for judgment notwithstanding the verdict.
Plaintiff’s action is based upon what he refers to as an oral contract between Pry and Kayser, made on a return trip of the two men from Climax, where they had conferred with Jurneke on the project. The sole evidence offered in support of plaintiff’s contention is the testimony of Pry, found in three folios of the record, as follows:
“A Yes. That was the only time that price came up, or working agreement was entered into. Mr. Kayser said, ‘What sort of a deal will Willard [Pry’s supplier] give you if they supply these mixers on Card Iron Works cars?’ I said, The discount would be the same, twenty-three percent and discount on cash payment.’
“Q Twenty-three per cent?
“A Of the total unit on the car, it was a unit, it wasn’t any piecemeal deal, the mixer and all component parts was to be considered a unit, the same as an automobile. My discount would have been twenty-three and two per cent off of whatever price Willard quoted.
“Q Is this the conversation you had with Mr. Kayser?
“A Right, with Mr. Kayser. He said, ‘Well, would you be willing to work for anything less than that to try to hold this bid price down if we work with White-man [Kayser’s supplier] on Whiteman mixers?’ I said, ■Well, I believe I would consider the fact that if we used Card’s cars and if the bowls [barrels] were shipped *320 in here from Whiteman and the machine was fabricated here, we would be much closer to service Climax in case of difficulties which, when you are making a custom job it is possible to run into trouble,’ and, I said, ‘in view of this I would be willing to work on twenty per cent.’ Mr. Kayser said, T want to know what you will expect out of this because it will affect the price,’ and we just had a gentleman’s agreement.”
Even though Pry may have accurately reported this conversation, what Kayser contemplated appears to be perfectly clear. He expected to participate in a bid for this job and, as he stated, it was necessary to ascertain all data as to cost of component parts, such as the barrels and rail cars, and any commissions to be charged by the suppliers. The percentage to be charged by Pry along the way must be included in the proposed bid of the component parts.
Kayser emphatically denied that a conversation, as testified to by Pry, ever took place. He testified:
“A * * * It was all settled at the first meeting. I said, ‘Whatever I might make out of it, I will give you a third of it.’ * * *
“A * * * If that it ever occurred to me that Pry wanted to get twenty per cent out of that thing, never in any manufacturing of a — you might say a prototype — is there any kind of margin like that. I wouldn’t have wasted five minutes talking to him or anyone else, so don’t be ridiculous.”
The record does not show that anyone ever agreed to pay Pry a twenty percent commission on this sale to Climax. Plaintiff is not suing for a broker’s fee or compensation on a quantum meruit basis, but relies solely upon the alleged contract for recovery. Neither Pry nor Kayser made the sale to Climax, and there was no contractual relationship between Pry and Card Iron Works Company, whose bid Climax accepted.
Pry did not represent Card in any way. He was not a party to any written agreement involving the sale or *321 with reference to any commission on the sale. In fact he admits: “My commission was just another component part to estimate that bid.”
The evidence contained in the record fails to establish the claim of plaintiff that it is entitled to a commission on this sale, because it does not establish the existence of any valid contract providing for the payment of such a commission by either Card Iron Works Company, the seller; the Climax Company, the buyer; or Kayser.
We hold that the court was right in setting aside the verdict and the judgment entered thereon, for the reason that the verdict was not consistent with or supported by any theory of the evidence.
 In Burns-Moore Co. v. Watson, 45 Colo. 91, 101 Pac. 335, this court held that:
“* * * A jury has no right to render a capricious and arbitrary verdict in total disregard of the facts. A verdict must be consistent with some legitimate theory of the testimony, or what the testimony tends to prove, and where it is not warranted by any legitimate analysis of the evidence, or what may be fairly inferred therefrom, it should be set aside.”
The judgment is wrong when there is no basis in the evidence for the amount of the verdict as returned by the jury. Lenander v. Graves, 45 Colo. 246, 100 Pac. 403.
Pry claimed that he was entitled to a 20% commission of $15,243 on the net sales price of the cement mixers. Kayser admitted an indebtedness to Pry of $640. Under the testimony and the instructions plaintiff was entitled either to $15,243 as his commission under the alleged contract or to judgment for $640, the amount admittedly due from Kayser under a former understanding.
Other cases containing language in support of the two cases cited above are as follows: Rocky Mountain Fuel Company v. Belk, 92 Colo. 404, 21 P.2d 186; Galligan v. Luther, 54 Colo. 118, 128 Pac. 1123; Jensen v. Nall, 53 Colo. 212, 124 Pac. 471; Burlington Interurban Ry. Co. *322 v. Chapman, 53 Colo. 28, 123 Pac. 649, and Hassell I. W. Co. v. Cohen, 36 Colo. 353, 85 Pac. 89. It is doubtful that lengthy quotations from, or comment upon, the cited cases would serve any worthwhile purpose, and we therefore refrain from doing so.
The principles enunciated in the cited cases are authority which is determinative of the issue presented in this case. The issue was raised by Kayser at his first opportunity in paragraphs 14 and 15 of his motion for judgment notwithstanding the verdict.
No cases are cited holding contrary to the general rule followed in the Colorado cases to the effect that a verdict must be consistent with some legitimate theory of the testimony and when it is not it should be set aside.
Applying the established principles to the instant case, we find that the case was properly submitted to the jury on conflicting evidence as to the only issue raised, namely, whether there was a valid contract between plaintiff and defendant under the terms of which plaintiff was entitled to recover the sum of $15,243 plus interest and costs, and whether there had been a breach of such a contract. The verdict of the jury was inconsistent with any legitimate theory of the testimony and, for that reason, had to be set aside.
The trial court’s finding, upon ruling on the motion for judgment notwithstanding the verdict of the jury, that the verdict was not supported by the evidence, is harmonious with the evidence presented in the record. Moreover, the court’s final judgment in favor of the plaintiff, based upon the defendant’s admission, finds ample support in the record. Other arguments raised before this court are found to be without merit.
The judgment is affirmed.
Mr. Justice Day and Mr. Justice Pringle concur.